UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| NUAXESS 2, INC.,<br><br>　　　　　　　　　　　　Plaintiff,<br><br>　　　　-against-<br><br>ADLER WINDOWS, INC.,<br><br>　　　　　　　　　　　　Defendant. | Case No.:<br><br>**COMPLAINT**<br>**WITH JURY DEMAND** |

Plaintiff NUAXESS 2, INC., by its undersigned counsel, complaining of defendant ADLER WINDOWS, INC., alleges as follows.

## NATURE OF THE ACTION

1. As set forth herein, Plaintiff provided staffing services to Defendant in 2022.

2. In January 2023, Plaintiff learned that Defendant misrepresented and omitted material information that induced Plaintiff to provide and to continue to provide staffing services, including health benefits, at a greatly reduced rate and which caused Plaintiff to incur excessive damages.

3. As a direct and foreseeable consequence of Defendant's misconduct alleged herein, Plaintiff has been damaged in an amount to be determined at trial, but not less than $3,000,000.00.

## PARTIES

4. Plaintiff NuAxess 2, Inc. ("NuAxess" or "Plaintiff") is a corporation formed under the laws of the State of Delaware with its principal place of business in Garland, Texas.

5. Defendant Adler Windows, Inc. ("Adler Windows" or "Defendant") is a corporation formed and existing under the laws of the State of New York with a principal place of business located at 175-16 Liberty Ave, Jamaica, New York 11433.

**JURISDICTION AND VENUE**

6. Personal jurisdiction over Defendant is derived by Defendant's business in the State of New York as well as Defendant's registration to do business in the State of New York. Defendant is a domestic New York corporation.

7. Subject matter jurisdiction is based on diversity of citizenship between the parties pursuant to 28 U.S.C. § 1332(a)(1) in that Plaintiff is a citizen of Texas and Defendant is a citizen of New York. The amount in controversy exceeds $75,000.00.

8. Venue in this District is proper based upon the business offices of Defendant in Queens County and one or more transactions complained of herein occurred in this District.

**FACTS COMMON TO ALL COUNTS**

**A.** **The Parties' Businesses**

9. Plaintiff provides consulting and staffing services related to employee benefits, insurance, and financial services to its clients.

10. Plaintiff also provides technology innovations and affordable major medical health insurance plans and other employee benefit products and services through its service platforms.

11. One such benefit product that Plaintiff provides is its NuAxess Healthcare Plan ("NHP" or "Plan"), which is a proprietary self-insured health plan that is ERISA-qualified.

12. The NHP includes, *inter alia*, wellness and prevention programs, employee health saving accounts, transparency in provider costs and claims data, and shared savings programs.

13. Plaintiff provides employers and their employees with valuable aggregated HIPAA-compliant data through Plaintiff's employer of record staffing companies, use of contracted professional employer organization services, and its proprietary healthcare account administration.

14. This aggregated HIPAA-compliant data can be used to analyze and evaluate healthcare services used to support medical reinsurance stop-loss risk taking business via captive reinsurance companies.

15. Defendant is engaged commercial and residential in window design, specification, consulting, engineering, manufacturing, and installation.

**B.     The Parties Commence Business Relations**

16. In or around February 2022, MJ Recruiting, Inc., a staffing and insurance brokerage based in Roslyn, New York ("MJ Recruiting"), referred Adler Window's Chief Financial Officer, Eric Weinstein ("Weinstein") to Plaintiff.

17. At that time, Weinstein, on behalf of Adler Windows sought staffing services and accompanying health benefits for Defendant's employees.

18. After initial introductory phone calls, Plaintiff forwarded application materials to Defendant.

19. Among the application materials was the Special Risk Questionnaire ("SRQ").

20. The application materials were material and necessary for Adler Windows to become Plaintiff's client so that Defendant's employees could become co-employees of Plaintiff for purposes of administering the NHP.

21. Plaintiff's primary service to Defendant under the NHP was to provide health claim administration and resolution on behalf of Defendant's employees.

22. Therefore, Plaintiff screened Defendant as a potential co-employer of Defendant's employees through the use of the SRQ.

23. Responses to the SRQ are intended to disclose the health status of the potential co-employee group.

24. The SRQ responses bear directly on Plaintiff's business model.

25. Plaintiff used Defendant's responses to the SRQ to determine the cost of staffing fees that Plaintiff would charge Defendant.

26. Plaintiff used Defendant's responses to the SRQ to determine whether Plaintiff would accept Defendant's employees or group of employees.

27. Defendant's SRQ responses provided material documentation and information to Plaintiff.

28. Plaintiff used Defendant's SRQ responses to assess the feasibility of signing Defendant to the NHP and to properly price Plaintiff's charges to Defendant for the NHP service.

29. During the application process, Defendant responded to Plaintiff with an SRQ response that Weinstein signed and verified on behalf of Defendant on or about March 7, 2022.

30. A potential co-employee in Defendant's applicant group of employees would be considered "special risk" within the meaning set forth in the SRQ if such person was:

    (a) Confined to a medical facility (acute, skilled or rehabilitation);

    (b) On a left ventricular assist device (LVAD), ventricular assist device (VAD), or ventilator dependent;

    (c) Experiencing a high risk pregnancy;

    (d) Currently receiving dialysis or has been diagnosed with end stage renal disease;

    (e) Not actively at work due to disability or is working reduced hours due to illness or injury;

  (f)  An employee who is not actively at work dur to disability, or who has been absent from work more than 10 consecutive days within the past 12 months, or who is working reduced hours due to illness or injury.

31. A potential co-employee in Defendant's applicant group of employees would also be considered "special risk" within the meaning set forth in the SRQ if such person was diagnosed with or treated for any of the following conditions in the 12 months preceding the date of Defendant's SRQ response:

  (a)  Heart or lung diseases;

  (b)  Lymphoma or leukemia;

  (c)  Cerebrovascular diseases including strokes;

  (d)  Chronic liver disease

  (e)  Malignant neoplasm or carcinoma;

  (f)  Multiple Sclerosis;

  (g)  Amyotrophic Lateral Sclerosis (ALS disease);

  (h)  Hemophilia;

  (i)  Cystic fibrosis;

  (j)  Gaucher's disease;

  (k)  Growth hormone deficiency;

  (l)  HIV;

  (m)  Certain transplants;

  (n)  Acute or chronic pancreatitis;

  (o)  Acute or chronic renal failure;

  (p)  Spinal cord injury;

   (q)  Severe burns;

   (r)  Other major trauma;

   (s)  Intracranial injury;

   (t)  High Risk infants;

   (u)  Multiple Gestation.

 32. The SRQ required Defendant to disclose any of its employees in the applicant group that met the "special risk" test under the SRQ.

 33. Defendant could disclose such employees with reports or by writing the employees' names in a chart in the SRQ itself.

 34. Plaintiff's application process also required Defendant to submit a census ("Census").

 35. Defendant's Census was to fully detail the list of all employees of Adler Windows, including their names, social security numbers, gender, birth date, primary address, lived in state, worked in state, personal e-mail, work e-mail, personal phone, work phone, ethnic group, race/ethnicity, marital status, marital status effective date, tobacco user status, job title, hire date, rehire date, termination date, years of service, name of the person to whom the employee reports, scheduled hours, standard hours, annual salary, benefit earnings annual amount, benefit earnings effective date, similar information concerning all dependents, whether the employee is waiving medical or dental or vision and the reason why, and current and historical medical and dental and vision provider information.

 36. Defendant was further required to provide the cost renewal proposal for their current health insurance so that Plaintiff could determine a proper rate for staffing fees (the NHP services).

 37. Plaintiff relied on the accuracy and honesty of Defendant's application information in deciding if Plaintiff would co-staff Defendant's employees to provide the NHP services.

38. Defendant was required to update the SRQ and Census when new employees of Defendant's company were onboarded.

39. Plaintiff reserved the right in the SRQ to revise premium rates, deductibles, deductible factors, and other terms and conditions of the NHP policy according to Plaintiff's underwriting practices retroactive to the NHP's original effective date if Defendant failed to disclose an individual who should have been disclosed as a special risk.

40. By signing the SRQ, Defendant represented to Plaintiff that Defendant:

   (a) Consulted with its pre-certification, utilization review and case management vendors, to obtain information;

   (b) Consulted with is Human Resources department to identify employees on FMLA, extended sick leave, leave of absence, or short- or long-term disability;

   (c) Disclosed each individual covered under the benefit plan who is or may be a special risk.

41. Plaintiff is a self-funded, self-insured staffing company whose business model wholly depends and materially relies on accurate information concerning prospective co-employees.

42. All members of the NHP rely on each other to be truthful in submitting information to the self-funded Plan, which operates as a collective fund to pay health benefit claims for all members.

43. Every co-employee relies on the honesty and integrity of their co-employees, as those who misrepresent their health status necessarily use a disproportionate amount of Plan funds to pay their unanticipated claims.

44. Such unanticipated claims submitted by unscrupulous co-employees endangers the solvency of the self-funded Plan for all.

45. As such, NuAxess is not an insurance company and is no place for "special risk" individuals.

46. In the event co-employees' health claims exceed Plaintiff's revenues, Plaintiff's business would be in jeopardy.

47. According to Adler Window's SRQ responses, not a single employee was identified as an individual who should be disclosed as a special risk.

48. According to Plaintiff's Census, Adler Windows had 30 employees in the applicant group as of in or around February or March of 2022.

**C.** **Plaintiff Performs Staffing Services**

49. Based on the documentation Mr. Weinstein provided Plaintiff during the application and screening process indicating that there were no prior serious ailments among the employees, Plaintiff began performing staffing services for Defendant's 30 employees as co-employer, including administration of the NHP, beginning June 1, 2022.

50. Shortly after the June 1, 2022 term commencement, several of Defendant's employees presented substantial claims to Plaintiff for payment under the NHP.

51. These presentments belied Adler Windows's signed verification to Plaintiff that Adler Windows had no special risk employees when Defendant signed the SRQ response in March 2022.

52. For instance, one co-employee was undergoing active cancer treatment with multiple treatment visits within the first weeks of the June 1, 2022 term's commencement and continuing through the entire period with over 50 additional occurrences/visits/treatments over a 6-month period.

53. In addition, multiple employees of Adler Windows were taking specialty medications known to be prescribed to treat chronic blood pressure conditions, high cholesterol, asthma, and anti-rejection medication for transplant patients, among many others.

54. All of the foregoing fall within the SRQ's definition of "special risk."

55. Another co-employee incurred over $255,000.00 in medical claims within three months of the NHP term's commencement.

56. Over the course of seven (7) months, from June 1, 2022 to December 31, 2022, Adler Windows paid Plaintiff a total of Two Hundred Nineteen Thousand Seven Hundred Twenty-Four Dollars and Forty Cents ($219,724.40) in staffing fees.

57. Over the course of seven (7) months, from June 1, 2022 to December 31, 2022, Defendant's 30 co-employees' health care providers billed Plaintiff a total of Eight Hundred Seventy-Five Thousand Seven Hundred Fourteen Dollars and Fifty-Two Cents ($875,714.52) in medical costs and Thirteen Thousand Six Hundred Fifty-Nine Dollars and Seven Cents ($13,659.07) for dental and vision costs – four times greater than the staffing fees Plaintiff received from Adler Windows.

**D.** **Defendant's Misrepresentations**

58. The fact that several substantial claims from several Adler Windows co-employees were presented immediately after the term commencement belied Adler Windows's signed assertion that there were no special risk employees at Adler Windows when the SRQ responses were submitted.

59. In December 2022, Defendant provided Plaintiff with an updated Employee Census that listed over 140 full-time employees in March 2022.

60. The March 2022 Census Defendant provided to Plaintiff listed only 30 employees of Adler Windows as of February 2022.

61. Defendant omitted from the Census submitted to NuAxess over 110 individuals who were active and full-time employees of Adler Windows at the time of the Census.

9

62. The 30 individuals submitted by Adler Windows for staffing and medical coverage were evidently <u>all</u> special risk individuals who either did not qualify for medical coverage through Empire or who caused the PEO to charge much higher premiums for these special risk individuals.

63. Defendant resolved this problem by misrepresenting the medical conditions of these 30 individuals to Plaintiff as persons who were not "special risk."

64. Defendant obtained these health benefits for these special risk individuals at prices reserved only for healthy individuals.

65. Defendant failed to advise NuAxess that any of the co-employees posed a special risk.

66. Defendant withheld the "special risk" status of these 30 employees from NuAxess.

**E.** **Termination of the NuAxess Plan**

67. Defendant's failure to disclose that these 30 individuals posed a special risk caused the cancellation of the NuAxess staffing platform with Defendant on December 31, 2022.

68. Due in part to Defendant's misrepresentations and omissions in failing to disclose these 30 individuals as special risk, Plaintiff has been unable to accept new business.

69. As a result of Defendant's inability to accept new business, it has sustained a significant loss in market value and in profits.

**FIRST CAUSE OF ACTION**
**(Fraudulent Misrepresentation / Omission)**

70. Plaintiff repeats and realleges the statements set forth hereinabove as though fully stated herein and further alleges as follows.

71. There was a failure to disclose to Plaintiff that a majority if not all of Defendant's 30 employees in the group of potential co-employees were "special risk" within the meaning in the SRQ.

10

72. Defendant is responsible for the failure to disclose that a majority if not all of its 30 employees in the group of potential co-employees were "special risk" within the meaning in the SRQ.

73. Defendant provided a Defendant-verified SRQ response to Plaintiff with the intent that Plaintiff rely thereon.

74. Defendant provided a Defendant-verified SRQ response to Plaintiff as part of Defendant's application for Plaintiff to provide Defendant with staffing and NHP services.

75. Based on the Defendant-verified SRQ response to Plaintiff and other application materials described herein, Defendant obtained Plaintiff's staffing and NHP services.

76. Based on the Defendant-verified SRQ response to Plaintiff and other application materials described herein, Defendant obtained Plaintiff's staffing and NHP services, including health claims coverage, at a substantially reduced rate.

77. Plaintiff relied on the Defendant-verified SRQ response and other application materials described herein in agreeing to and in providing the staffing and NHP service to Defendant.

78. The Defendant-verified SRQ response and other application materials described herein were false when made.

79. The Defendant's Census set forth that Defendant had 30 active full-time employees.

80. The Defendant-verified SRQ response represented there were no "special risk" employees of Adler Windows.

81. At the time Defendant made the Census, it had over eligible 140 employees – not 30.

82. At the time Defendant signed the SRQ response, all or a majority of the 30 employees were "special risk" within the meaning set forth in the SRQ.

83. Defendant further failed to advise Plaintiff of "special risk" individuals at any time after Plaintiff began providing staffing and NHP services for Defendant.

84. Upon information and belief, Defendant withheld the above crucial information from Plaintiff with the intent to obtain health care coverage for employees who were otherwise uninsurable or too expensive to cover through traditional health insurance plans.

85. Plaintiff materially and reasonably relied on Defendant's communications, misrepresentations, and including the absence of vital information, to Plaintiff's detriment.

86. But for Defendant's misrepresentations and omissions, Plaintiff would not have approved Defendant for the staffing and NHP service.

87. As a direct and foreseeable consequence of Defendant's misrepresentations and omissions, Plaintiff has been damaged in the amount of claims liabilities incurred on account of Defendant's employees health benefit claims, minus staffing fees received from Defendant, plus interest, as well as lost profits and market valuation damages, in an amount to be determined at trial but not less than Three Million Dollars ($3,000,000.00), plus, punitive damages.

**SECOND CAUSE OF ACTION**
**(Breach of Contract)**

88. Plaintiff repeats and realleges the statements set forth hereinabove as though fully stated herein and further alleges as follows.

89. By signing the SRQ response, Defendant agreed that one of Plaintiff's remedies for the failure to disclose an individual who should have been disclosed as a special risk was the ability to revise premium rates, deductibles, deductible factors, and other terms and conditions of the NHP policy according to Plaintiff's underwriting practices retroactive to the NHP's original effective date.

90. Plaintiff performed by providing the staffing and NHP service to Defendant.

91. Defendant failed to disclose to Plaintiff the individuals in the group of 30 employees that should have been disclosed as a special risk.

92. As a result, claims under Defendant's NHP with Plaintiff exceeded the premiums or staffing fees Defendant paid to Plaintiff.

93. Defendant has breached the SRQ by failing to disclose the individuals in the group of 30 that should have been disclosed as special risk.

94. Plaintiff is entitled to an award of contract damages in the amount of revised premium rates, deductibles, deductible factors, and other terms and conditions of the NHP policy according to Plaintiff's underwriting practices retroactive to the NHP's original effective date.

## THIRD CAUSE OF ACTION
**(Negligent Misrepresentation / Omission)**

95. Plaintiff repeats and realleges the statements set forth hereinabove as though fully stated herein and further alleges as follows.

96. Defendant held or appeared to hold unique knowledge concerning the "special risk" status of the 30 employees Defendant identified for the provision of Plaintiff's staffing/NHP services.

97. Defendant made a written representation to Plaintiff concerning the "special risk" status of the 30 employees Defendant identified for the provision of Plaintiff's staffing/NHP services.

98. Defendant knew that Plaintiff would use the disclosed "special risk" status of the 30 employees Defendant identified for pricing and determination of Plaintiff's staffing/NHP services.

99. Defendant's and Plaintiff's relationship concerning the provision of Plaintiff's staffing/NHP service imposed an appreciable level of trust and confidence in the truthfulness of the information Defendant disclosed to Plaintiff concerning Defendant's 30 employees.

100. Due to the parties' relationship of trust and confidence, Defendant had a duty to disclose individuals in the group of 30 employees that were or that may be a "special risk" at the time Defendant signed the SRQ.

101. Due to the parties' relationship of trust and confidence, Defendant had a continuing duty to disclose individuals in the group of 30 employees that were or that may be a "special risk" at any time during the NHP term and after Defendant signed the SRQ.

102. The "special risk" status of most or all of the 30 identified employees which Defendant identified was incorrect or withheld from Plaintiff.

103. Plaintiff reasonably relied on Defendant's incorrect information or omission concerning the "special risk" status of most or all of the 30 identified employees.

104. As a direct and foreseeable consequence of Defendant's misrepresentations and omissions, Plaintiff has been damaged in the amount of claims liabilities incurred on account of Defendant's employees health benefit claims, minus staffing fees received from Defendant, plus interest, as well as lost profits and market valuation damages in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**
**(Unjust Enrichment)**

105. Plaintiff repeats and realleges the foregoing allegations as though fully stated herein, and further alleges as follows in the alternative to the Second Cause of Action.

106. Defendant was aware Plaintiff's existence at all relevant times.

107. Defendant was aware at all relevant times that approximately 30 of Defendant's employees received comprehensive health care benefits through Plaintiff's NHP.

108. Defendant was aware at all relevant times that the cost to Defendant of Plaintiff's provision of the NHP services to Defendant and its employees was significantly less than what it would have cost Defendant if Defendant had disclosed the correct "special risk" status of its employees to Defendant.

109. Defendant was enriched by the low-cost comprehensive medical care and benefits provided to Defendant's employees under the NHP due to the incorrect "special risk" disclosure.

110. Defendant's enrichment was at Plaintiff's expense in an amount to be determined at trial, but not less than the cost that Plaintiff would have charged Defendant had Defendant provided correct information to Plaintiff concerning the "special risk" status of the covered employees.

111. It is against equity and good conscience to permit Defendant to retain the benefit conferred on Defendant and its employes without payment therefor to Plaintiff.

112. Defendant has an equitable obligation to Plaintiff to compensate Plaintiff for the benefit conferred on Defendant and its employees under the NHP.

113. Due to Defendant's unjust enrichment, Plaintiff is entitled to compensatory damages in an amount to be determined at trial, plus interest.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendant as follows.

A. On the FIRST CAUSE OF ACTION, in the amount of claims liabilities incurred on account of Defendant's employees health benefit claims, minus staffing fees received from Defendant, plus interest, as well as lost profits and market valuation damages in an amount to be determined at trial, but in no event less than $3,000,000.00, plus punitive damages.

B. On the SECOND CAUSE OF ACTION, in an amount to be determined at trial and comprised of revised premium rates, deductibles, deductible factors, and other terms and conditions of the NHP policy according to Plaintiff's underwriting practices retroactive to the NHP's original effective date, plus interest.

      C.      On the THIRD CAUSE OF ACTION, in the amount of claims liabilities incurred on account of Defendant's employees health benefit claims, minus staffing fees received from Defendant, plus interest, as well as lost profits and market valuation damages in an amount to be determined at trial, but in no event less than $3,000,000.00.

      D.      On the FOURTH CAUSE OF ACTION, compensatory damages in an amount to be determined at trial, plus interest.

      E.      Such other and further relief as the Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all questions of fact raised by the Complaint.

Dated: New York, New York
       March 6, 2023                         WOODS LONERGAN PLLC

                                                              Lawrence Lonergan, Esq. (LL4744)
                                                               James F. Woods, Esq. (JW3211)
                                                               Annie E. Causey, Esq. (AC5795)
                                                               60 East 42nd Street, Suite 1410
                                                               New York, NY 10165
                                                               (212) 684-2500
                                                               llonergan@woodslaw.com
                                                               jwoods@woodslaw.com
                                                               acausey@woodslaw.com
                                                               *Attorneys for Plaintiff*